JONES, JUDGE:
The claimant, Peter P. Cassel, individually, and by Ruth M. Cassel, his mother and next friend, claims damages in this case against the Department of Highways, formerly State Road Commission, in the amount of Four Hundred Thousand Dollars ($400,000.00) for personal injuries, and Ruth M. Cassel, in her own right, claims damages in the amount of One Hundred Thousand Dollars ($100,000.00) for medical, hospital and rehabilitation expenses resulting from the wreck of an *255 Austin-Healey Sprite automobile, driven by Glenn R. Wenzel, along West Virginia Route No. 67, in Brooke County, on the 8th day of September, 1967, at about 11:50 p. m., at which time the claimant, Peter P. Cassel, was a passenger in said car. Cassel and Wenzel were students and fraternity brothers at Bethany College. Cassel was nineteen years old, just starting his sophomore year, and Wenzel, twenty, was in his junior year. The claimant as a freshman, had made the N.A.I.A. All-America Swimming Team and was an outstanding prospect for national and perhaps Olympic honors as a swimmer.
Earlier in the evening, both boys had gone, in separate cars, to Harry’s Bar in Wellsburg for sandwiches and beer, and after returning to their fraternity house, again in separate cars, they went to a place on Route 67, near the Pennsylvania State Line known as Emily’s or Buffalo Inn, apparently a favorite gathering place for Bethany students. After about two hours, Wenzel let it be known that he was going back to school and asked if anyone wanted to ride with him. The claimant accepted the invitation. As they took their places in the two bucket-seats, they fastened their seatbelts and rode away with the top of the car down. At a point approximately one mile east of Bethany, the Wenzel car failed to negotiate a dangerous horseshoe curve known in the area as “Gibson’s Turn.” The Wenzel car crossed the highway to its left, ran over about a ten-foot embankment and turned over, trapping both passengers under the vehicle. The claimant and Wenzel were extricated from the wreck by friends who were following in another car but did not witness the accident. The following day the driver, Wenzel, pleaded guilty before a Justice of the Peace to a charge of failure to have his vehicle under control.
The claimant suffered a broken neck and his spinal cord was injured between the sixth and seventh vertebrae resulting in paralysis from his chest down through and including his lower extremities and also paralysis in the extremities of his fingers and hands. He was taken by ambulance to North Wheeling Hospital where he remained until September 12, 1967, when he was transferred to a hospital in his home city, Buffalo, New York, where he was treated by Dr. George A. Cohn, who diagnosed his case as a fracture dislocation of the cervical spine. On October 31, 1967, the claimant was admitted to Rusk *256 Institute, the rehabilitation center of New York University in New York City and remained a patient there and in the New York University Medical Center Hospital until May 1969. The claimant is a quadriplegic; his lower extremities are completely paralyzed and he has partial paralysis of the upper extremities. He will require continued medical treatment so long as he lives and his life expectancy is nearly normal. Dr. Donald A. Covalt, Associate Director of the Institute of Rehabilitation Medicine of New York University Medical Center, comments on the permanency of the injuries as follows: “Peter is now completely disabled and as far as physical work is concerned, he must contemplate a wheelchair existence for the rest of his life.”
The claimant charges that his injuries are the proximate result of acts or omissions of the respondent constituting negligence, substantially as follows:
(1) The curve in question at the time of the accident was completely and totally unmarked by signs or warning devices of any type or nature;
(2) The curve was completely and totally unprotected by guardrail around the same; and
(3) The paved portion of the road on said curve was in a defective condition and contained a rut variously described as approximately three to six inches deep and approximately twelve to fifteen feet long. The claimant further contends that the respondent had notice of these hazards and failed to do anything about them.
First we will dispose of the matter of signs and guardrails. There is conflicting evidence as to whether there was a curve sign at a proper location, or whether there was no sign, or a •damaged sign. Years before, perhaps twenty or more, a guardrail had been constructed around this curve but apparently for reasons of economy or upon judgment that such guardrail was unnecessary, the same was allowed to deteriorate until only remnants remained — a few rotten posts and no cable. This curve was well known to the driver and his passenger, the claimant, and we do not believe that their conduct on entering the curve was affected in any way by the absence of warning *257 signs or guardrails. The driver testified that he was not misled by the absence of either. In any event, we will apply the law laid down in Adkins v. Simms, 130 W.Va. 645, 46 S.E. 2nd 81 (1947), as follows:
“We do not think the failure of the state road commissioner to provide guardrails and roadmarkers, and to paint a center line on the highway, constitutes negligence of any character, and particularly no such negligence as would create a moral obligation on the part of the State to pay damages for injury or death, assumed to have occurred through such failure, and as the proximate cause thereof. The very nature of the obligation of the State, in respect to the construction and maintenance of its highways, precludes the idea that its failure to exercise discretion in favor of a particular location over another, or whether it should provide guardrails, center lines or danger signals at that point, is an act of negligence. Certainly, it must be known, as a matter of common information, that places of danger on our highways exist at innumerable points, particularly on our secondary roads, and in many instances on primary roads. This being a mountainous country, many of these roads are narrow, with steep grades and sharp curves. Considering the financial limitations placed upon the road commissioner, it would seem impossible to take care of all defects at one time, even in one year, assuming that labor and supplies could be made available. In the very nature of things the road commissioner must be permitted a discretion as to where the public money, entrusted to him for road purposes, should be expended, and at what point guardrails, danger signals and center lines should be provided, and the honest exercise of that discretion cannot be negligence.”
The difficult crux of this case involves the claimant’s charge that respondent was negligent in permitting a defect in the public road to exist and failing to repair the same after it knew or should have known that the defect was hazardous to the traveling public. The defect was described by the driver Wenzel as a “rut” three inches deep and ten to fifteen feet long. Wenzel referred to the “rut” in his testimony as follows: “* * * Something like grabbed the front end of the car and put me out of line where I was intended to go. I had no control. * * * I could not steer. My wheels were locked. I would say the righthand wheel was caught in a rut which was directing the control of the car.” John Cruchiak, Jr., Mainte *258 nance Superintendent of the West Virginia Department of Highways for Brooke County, would not call the defect a rut but described the condition as the result of an overlapping of the last laid asphalt over an old blacktop surface, the new layer of asphalt not having a proper base and consequently breaking down. This witness described the defective condition as “frayed.” A photograph introduced in evidence lends some confirmation to both of these descriptions. While the picture shows a depression on the paved portion of the road, it appears that there is a stepped drop-off to the shoulder of the road, the so called rut being the first step and then another drop-off of three to four inches to the shoulder.
Drop-offs, frayed edges and ruts along the borders of our highways are a way of life in West Virginia. The traveling public contends with them every day in all parts of the State. In this case there was a defect in the highway, but the question is whether the break in the pavement was such a defect as would support a claim of negligence and a consequent moral obligation of the State to- compensate the claimants for their injuries and expenses. The evidence discloses that Route 67 was patched from end to end each year, and the Maintenance Superintendent for Brooke County testified that unusual hazards were corrected upon discovery insofar as funds were available.
We are not impressed by the testimony of the Deputy Sheriff who said he had given notice of the hazardous condition of the curve to the State Road Office and to other State Road employees. This is the same Deputy Sheriff who investigated the accident and wrote in his report that no defect existed, then, after examining the road later in daylight, changed his report to show a defect. The other investigating officer testified that he did not notice any defect at the time of the accident. Both the Maintenance Superintendent and the State Road Office and Maintenance Secretary testified that no notice was ever given to them by anyone that a hazardous condition existed at Gibson’s Turn. The Maintenance Superintendent further testified that he traveled the road frequently and had observed no condition at Gibson’s Turn which he would consider out of the ordinary. All witnesses agreed and *259 confirmed the common knowledge that Gibson’s Turn, in itself, is a hazardous curve, requiring extreme care by all who traverse it.
Apparently, the five to six-inch ground clearance of the Austin-Healey car and its small tires increased the danger of a drop-off and driving with the top down added to the chance of personal injuries. This in many ways was a “freak” accident insofar as the magnitude of the claimant’s injuries is concerned, as the car turned over rather slowly, without great violence, and the driver was only slightly injured.
Following decisions of the Supreme Court of Appeals of West Virginia, this Court has consistently held that the State is not an insurer and its duty to travelers is a qualified one, namely, reasonable care and diligence in the maintenance of its highways under all the circumstances. The maintenance of highways is a governmental function and funds available for road repairs are necessarily limited. We do not believe there is a clear showing in this case that the respondent knew or should have known that such a dangerous condition existed as reasonably would be expected to cause injury or damage to users of the highway. In our opinion, the claimants have not proved such a positive neglect of duty by the respondent as would create a moral obligation on the part of the State to pay damages to the claimants.
Even though we assume arguendo that the respondent failed to exercise ordinary and reasonable care in the repair and maintenance of this highway, we are of the opinion that the rut or break complained of could only have been a remote and incidental cause of the injuries sustained by the claimant Peter Cassel and not the efficient proximate cause thereof. The physical facts and circumstances persuasively indicate that Wenzel’s careless and improper driving was the proximate cause of the accident, and such finding is supported by the driver’s plea of guilty to the charge of failing to have his vehicle under control.
The Court is not unmindful of the terrible tragedy involved in this case, nor of the inherent impulse for compassion. The courage of Peter Cassel commands respect, and his needs are of such magnitude that our decision becomes an extremely un *260 happy one. We are further constrained to say that this case was ably tried, briefed and argued by counsel for the claimants. However, we believe that our findings of fact and our view of the law of the State of West Virginia governing this case require the disallowance of these claims and, accordingly, the same are hereby dismissed.